# Order

Michigan Supreme Court
Lansing, Michigan

May 8, 2009

136961

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

EXPRESS PLUMBING, HEATING &
MECHANICAL, INC.,
　　　　　Employer-Appellant,

v

LINDA S. BECHLER,
　　　　　Claimant-Appellee,

and

DEPARTMENT OF LABOR & ECONOMIC
GROWTH, UNEMPLOYMENT INSURANCE
AGENCY,
　　　　　Appellee.
_____/

SC: 136961
COA: 282310
Oakland CC: 2007-084403-AE

On order of the Court, the application for leave to appeal the July 8, 2008 order of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

MARKMAN, J. (*dissenting*).

Because I believe the Michigan Employment Security Commission (MESC), in a split decision, erred in finding that the claimant was qualified to receive unemployment benefits after she *voluntarily* left her job with her employer, I dissent. Unemployment benefits in this state are intended for individuals – of whom there is no current shortage – who find themselves "unemployed through no fault of their own." MCL 421.2. However, in this case, such benefits are paid to support the claimant's *own* decision to become unemployed out of unhappiness with her employer's altogether-reasonable expectation that she provide a full day's work in exchange for her compensation.

"[A]n individual is disqualified from receiving [unemployment] benefits if he or she . . . [l]eft work voluntarily without good cause attributable to the employer . . . ." MCL 421.29(1)(a). "'[G]ood cause' compelling an employee to terminate his

employment should be found where an employer's actions would cause a reasonable, average, and otherwise qualified worker to give up his or her employment." *Carswell v Share House, Inc*, 151 Mich App 392, 396-397 (1986).

In 2000, the employer hired the claimant to provide assistance with its storage rental business. The claimant subsequently resigned in May 2006 and sought unemployment benefits. In finding that the claimant had "good cause" for leaving her job, and therefore qualifying for unemployment benefits, the administrative hearing officer cited new services in which the employer became involved that required the claimant to perform new duties. Yet, the claimant began performing these duties without objection long before she quit in May 2006. The claimant testified that a rental truck moving service began in December 2000, approximately six months after she began her employment; furnace sales began in March 2002; a shrink wrap service began in September 2003 and ended in April 2005; and sign sales began in November 2003.

The claimant's duties with respect to these new services were similar to her duties performed with respect to the storage rentals. Mainly, she interacted with customers and provided them with information and service. The claimant never indicated that she was not qualified to perform her new duties; nothing indicates that she had any particular difficulty in completing these duties within her regularly-scheduled hours; and, as the hearing officer herself concluded, "[n]one of these tasks required a great deal of time for claimant to assist the customers with." Accordingly, in my judgment, it cannot be said that a reasonable employee would have relinquished her employment because of these new duties, given that the duties were well within the claimant's qualifications and she was able to reasonably complete these duties during her normal work hours.

The hearing officer noted that, based on daily reports transmitted to the employer's main place of business, which was separate from the storage rental facility, the claimant's tasks increased from an average of 7.4 "tasks" a day in 2000 to 17.7 "tasks" a day in 2005. These reports, however, afford no evidence at all of any particular *work* increase. For example, the claimant testified that one of her duties relating to the storage units was to process payments. In July 2000 reports, the claimant specified, "[p]rocessed several payments." Later, in an October 2005 report, she listed "[p]rocessed a couple payments," "[p]rocessed a couple more payments," and "[p]rocessed a phone credit card payment. And mailed out the receipt." Thus, although the number of recorded *entries* related to processing payments may have increased over this period, nothing is revealed about whether the actual *work* increased. The daily reports, in my view, fail to establish *any* increase in work and thus do not support the hearing officer's finding that the claimant had "good cause" to give up her employment.

Although an award for unemployment benefits is reviewed by this Court under a standard according considerable deference to the MESC's factual determinations, the

evidence here does not, in my judgment, support the conclusion that the claimant had good cause for quitting her employment. Instead, the evidence demonstrates that, although the claimant *may* have performed additional duties, in no way did those duties increase her workload beyond what she could reasonably perform during the workday. As the dissenting member of the MESC concluded:

> Here, the record showed the claimant did not have enough to do while on company time. The employer assigned her additional duties to keep her busy, and so that the claimant would not conduct her own personal business while on company time.

Being required to work during all hours of one's employment is hardly a circumstance of employment that would cause a reasonable person to leave. Rather, such an employee must expect that any position of employment, even one that may start out slowly, will eventually require the employee to be working during the hours for which he or she is being paid. To hold otherwise would seemingly permit an employee hired in the midst of a poor economy, when business is slow, to later assert "good cause" once the economy strengthens and the employer's business increases, based on the fact that such employee must then work harder. It is hard to imagine a less responsible unemployment compensation policy, and I do not see evidence in MCL 421.29(1)(a) that this is what Michigan has established. I would reverse the MESC's decision.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

May 8, 2009

_Corbin R. Davis_
Clerk

d0505